IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  08-CR-429 (CMR)** |
| **v.** | : | **DATE FILED: _____** |
| **ALI AMIRNAZMI** | : | **VIOLATIONS:** |
| | | **18 U.S.C. § 371 (conspiracy to violate** |
| | : | **IEEPA - 1 count)** |
| | | **50 U.S.C. § 1705(c) (violation of IEEPA -** |
| | : | **4 counts)** |
| | | **18 U.S.C. § 371 (conspiracy to act as** |
| | : | **illegal agent of foreign government - 1** |
| | | **count)** |
| | : | **18 U.S.C. § 951 (acting as illegal agent of** |
| | | **foreign government - 1 count)** |
| | : | **18 U.S.C. § 1001 (false statements to** |
| | | **government officials - 3 counts)** |
| | : | **18 U.S.C. § 1344 (bank fraud - 3 counts)** |
| | | **18 U.S.C. § 2 (aiding and abetting)** |
| | : | **Notice of forfeiture** |

**SUPERSEDING INDICTMENT**

**COUNT ONE**

(Conspiracy to Violate the International Emergency Economic Powers Act)

**THE GRAND JURY CHARGES THAT:**

**BACKGROUND**

At all times material to this superseding indictment:

1.      Defendant ALI AMIRNAZMI was a citizen of both the United States of America and the Islamic Republic of Iran ("Iran").

2.      Trantech Consultants, Inc. ("Trantech") was a business located in the Eastern District of Pennsylvania and registered under the laws of Pennsylvania.  Trantech was

operated by defendant ALI AMIRNAZMI and, among other things, marketed a proprietary

computer database and software system called "ChemPlan," which was described in promotional

materials as an innovative approach to strategic decision-making in the chemical process

industries.

3.      The National Petrochemical Company of Iran (NPC) was a company

located in Iran that was controlled in whole or in part by the Government of Iran.

4.      The Research Institute of Petroleum Industry (RIPI) was a company

located in Iran that was controlled in whole or in part by the Government of Iran.

5.      The Institute for Business Analysis and Consultancy (IBACO) was a

company located in Iran.

6.       The Nokhbegan Institute of Technology Development (NITD) was a

company located in Iran.

7.      The International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et

seq.*, granted the President the authority to, among other things, "investigate, . . . prevent or

prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation,

importation or exportation of, or dealing in, or exercising any right, power, or privilege with

respect to, or transactions involving, any property in which any foreign country or a national

thereof has any interest by any person, or with respect to any property, subject to the jurisdiction

of the United States . . . ." 50 U.S.C. § 1702(a)(1)(B).  Section 1701 granted the President the

power to exercise this authority upon declaration of a national emergency.

8.      Presidents of the United States have exercised their authority to declare a

national emergency with respect to Iran.  For example, on or about March 15, 1995, President

William J. Clinton issued Executive Order 12957, which, among other things, stated that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and therefore declared "a national emergency to deal with that threat." The national emergency with respect to Iran has been extended annually through successive presidential notices.

9.      Presidents of the United States later issued additional Executive Orders — Executive Orders No. 12959 (1995) and No. 13059 (1997) [collectively, the "Executive Orders"] — that subjected Iran to a comprehensive trade embargo. The Executive Orders prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

10.      The Executive Orders authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, to implement the sanctions imposed by the Executive Orders. Within the Department of the Treasury, the Office of Foreign Assets Control ("OFAC") was responsible for administering the ITR and deciding whether to issue licenses to engage in otherwise prohibited transactions with Iran.

11.     Among other things, the ITR provided the following:

(a)     31 C.F.R. § 560.204 prohibited "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran . . . including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that [1] Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or [2] Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran;"

(b)     31 C.F.R. § 560.203 prohibited "[a]ny transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part;"

(c)     31 C.F.R. § 560.206(a) prohibited a United States person, wherever located, from engaging "in any transaction or dealing in or related to (1) Goods or services of Iranian origin or owned or controlled by the Government of Iran; or (2) Goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran."  This regulation clarifies in 31 C.F.R. § 560.206(b) that "the term *transaction or dealing* includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing;"

-4-

(d)      31 C.F.R. § 560.207 prohibited "any new investment by a United States person in Iran or in property (including entities) owned or controlled by the Government of Iran."

12.      Defendant ALI AMIRNAZMI never obtained a license from OFAC to engage in transactions, investments, or other activities involving Iran.

## THE CONSPIRACY

13.      From in or about 1996 through and including in or about July 2008, in the Eastern District of Pennsylvania and elsewhere, defendant

**ALI AMIRNAZMI,**

a United States person, conspired and agreed with others known and unknown to the grand jury to knowingly and willfully violate IEEPA and the regulations promulgated thereunder, as described below, in violation of Title 50, United States Code, Section 1705.

## MANNER AND MEANS

It was a part of the conspiracy that:

14.      Defendant ALI AMIRNAZMI, and others known and unknown to the grand jury, engaged in transactions with companies located in Iran, including NPC, RIPI, IBACO, and NITD, despite knowing that such conduct was prohibited by United States law.

## OVERT ACTS

In furtherance of this conspiracy, defendant ALI AMIRNAZMI and others known and unknown to the grand jury committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

1.      On or about November 26, 1996, defendant ALI AMIRNAZMI received a fax from an official of NPC asking defendant AMIRNAZMI to provide information about a bank account in Europe through which NPC could make payment to him.

2.      On or about August 6, 1997, defendant ALI AMIRNAZMI, as President of Trantech, signed a licensing agreement with NPC in Tehran, Iran, in which NPC agreed to pay thousands of dollars to Trantech for the use of the ChemPlan database and software system.

3.      In or about June 1999, defendant ALI AMIRNAZMI caused another individual to hand-deliver a ChemPlan software update and other materials to an NPC official in Iran.

4.      On or about August 1, 1999, defendant ALI AMIRNAZMI sent an electronic mail message to an official of NPC requesting an opportunity to brief NPC over two consecutive days on ChemPlan and other customized services offered for sale by Trantech.

5.      On or about August 5, 2000, defendant ALI AMIRNAZMI transmitted a fax to an NPC official located in Iran confirming that the official received computer software that defendant AMIRNAZMI had purchased and shipped to NPC in or about July 2000 at NPC's request.

6.      On or about July 18, 2002, defendant ALI AMIRNAZMI requested a transfer of funds from Trantech's bank in Devon to a bank account located in Iran in order to pay for the printing of promotional materials in Iran.

7.      On or about July 30, 2004, defendant ALI AMIRNAZMI transmitted a letter from Devon to OFAC in which he stated that Trantech had been involved in only two transactions — which were unsuccessful attempts to transmit payments of $250 and $1,000, respectively — involving Iran since sanctions went into effect against Iran.

8.      In or about August 2007, defendant ALI AMIRNAZMI entered an agreement with RIPI under which he agreed to conduct negotiations on RIPI's behalf with a Danish chemical company for the purpose of establishing a joint venture in Iran of which Trantech would receive a 10% share.

9.      On or about December 28, 2007, defendant ALI AMIRNAZMI, as President of Trantech, signed a memorandum of understanding with IBACO regarding construction of a chemical plant in Iran of which Trantech would receive a share.

10.      On or about May 20, 2008, defendant ALI AMIRNAZMI attended a meeting in Tehran, Iran, with representatives of IBACO, in which the parties discussed their plans to build a chemical plant in Iran.

11.      On or about May 28, 2008, defendant ALI AMIRNAZMI, as President of Trantech, signed an agreement with NPC in Tehran, Iran, in which NPC agreed to pay at least $270,000 per year to Trantech for the use of the ChemPlan database and software system.

12.      On or about May 31, 2008, defendant ALI AMIRNAZMI, on behalf of Trantech, signed an agreement with IBACO in which defendant AMIRNAZMI agreed to accept a

15% share of a chemical plant to be built in Iran for which Trantech would help supply, among other things, software licensing, foreign equipment, and chemicals used in the plant.

13.     On or about June 2, 2008, defendant ALI AMIRNAZMI, as President of Trantech, signed a memorandum of understanding to create a joint venture with NITD in Tehran, Iran, in which, among other things, NITD pledged to evaluate a proposed $2.2 million investment to become Trantech's partner and Trantech pledged to transfer to Iran expert advice regarding the ChemPlan database and software system.

14.     On or about June 3, 2008, defendant ALI AMIRNAZMI arrived at the Philadelphia International Airport on a trip that originated in Tehran, Iran.

15.     On or about June 9, 2008, defendant ALI AMIRNAZMI used a calling card to call a representative of the Iranian Government from a payphone at a train station in Paoli.

16.     On or about June 13, 2008, after completing an interview with federal law enforcement officials, defendant ALI AMIRNAZMI left his home in Berwyn and used a calling card to call a representative of the Iranian Government from a payphone at a train station in Paoli.

All in violation of Title 18, United States Code, Section 371.

-8-

## COUNT TWO

(Violation of the International Emergency Economic Powers Act — NPC)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.    Paragraphs One through Twelve and Overt Acts One through Sixteen of Count One of this superseding indictment are realleged here.

      2.    From at least in or about 1996 through and including in or about July 2008, in the Eastern District of Pennsylvania and elsewhere, defendant

**ALI AMIRNAZMI,**

a United States person, willfully and knowingly violated and attempted to violate IEEPA, and the regulations promulgated thereunder, as described above, that is, without obtaining the required OFAC approval, defendant AMIRNAZMI engaged and attempted to engage in transactions relating to or dealing in goods, technology, and services for sale and supply to the National Petrochemical Company of Iran (NPC), a company located in Iran.

      In violation of Title 50, United States Code, Section 1701, et seq.; Executive Orders 12957, 12959, and 13059; Title 31, C.F.R. Section 560.201, et seq.; and Title 18, United States Code, Section 2.

## COUNT THREE

(Violation of the International Emergency Economic Powers Act — RIPI)

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.    Paragraphs One through Twelve and Overt Acts One through Sixteen of Count One of this superseding indictment are realleged here.

       2.    From in or about 2007 through and including in or about July 2008, in the Eastern District of Pennsylvania and elsewhere, defendant

**ALI AMIRNAZMI,**

a United States person, willfully and knowingly violated and attempted to violate IEEPA, and the regulations promulgated thereunder, as described above, that is, without obtaining the required OFAC approval, defendant AMIRNAZMI engaged and attempted to engage in investments and transactions relating to or dealing in goods, technology, and services for sale and supply to the Research Institute of Petroleum Industry (RIPI), a company located in Iran.

       In violation of Title 50, United States Code, Section 1701, <u>et</u> <u>seq</u>.; Executive Orders 12957, 12959, and 13059; Title 31, C.F.R. Section 560.201, <u>et</u> <u>seq</u>.; and Title 18, United States Code, Section 2.

## COUNT FOUR

(Violation of the International Emergency Economic Powers Act — IBACO)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     Paragraphs One through Twelve and Overt Acts One through Sixteen of Count One of this superseding indictment are realleged here.

      2.     From at least in or about mid-2007 through and including in or about May 2008, in the Eastern District of Pennsylvania and elsewhere, defendant

### ALI AMIRNAZMI,

a United States person, willfully and knowingly violated and attempted to violate IEEPA, and the regulations promulgated thereunder, as described above, that is, without obtaining the required OFAC approval, defendant AMIRNAZMI engaged and attempted to engage in investments and transactions relating to or dealing in goods, technology, and services for sale and supply to the Institute for Business Analysis and Consultancy (IBACO), a company located in Iran.

      In violation of Title 50, United States Code, Section 1701, <u>et</u> <u>seq</u>.; Executive Orders 12957, 12959, and 13059; Title 31, C.F.R. Section 560.201, <u>et</u> <u>seq</u>.; and Title 18, United States Code, Section 2.

## COUNT FIVE

(Violation of the International Emergency Economic Powers Act — NITD)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs One through Twelve and Overt Acts One through Sixteen of Count One of this superseding indictment are realleged here.

2.      From in or about 2007 through and including in or about June 2008, in the Eastern District of Pennsylvania and elsewhere, defendant

**ALI AMIRNAZMI,**

a United States person, willfully and knowingly violated and attempted to violate IEEPA, and the regulations promulgated thereunder, as described above, that is, without obtaining the required OFAC approval, defendant AMIRNAZMI engaged and attempted to engage in investments and transactions relating to or dealing in goods, technology, and services for sale and supply to the Nokhbegan Institute of Technology Development (NITD), a company located in Iran.

In violation of Title 50, United States Code, Section 1701, et seq.; Executive Orders 12957, 12959, and 13059; Title 31, C.F.R. Section 560.201, et seq.; and Title 18, United States Code, Section 2.

## COUNT SIX

(Conspiracy — Illegal Agent of Government of Iran)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs One through Twelve and Overt Acts One through Sixteen of Count One of this superseding indictment are realleged here.

2.      At no time material to this superseding indictment was defendant ALI AMIRNAZMI: (a) a duly accredited diplomatic or consular officer of a foreign government, recognized by the United States Department of State; (b) an officially and publicly acknowledged and sponsored official or representative of a foreign government; or (c) an officially and publicly acknowledged and sponsored member of the staff of, or employee of, any such officer, official, or representative of a foreign government.

## THE CONSPIRACY

3.      From in or about 1996 through and including in or about July 2008, in the Eastern District of Pennsylvania and elsewhere, defendant

**ALI AMIRNAZMI**

conspired and agreed with others known and unknown to the grand jury to act knowingly in the United States as an agent of a foreign government, specifically the Government of Iran, without prior notification to the Attorney General, as required by law, in violation of Title 18, United States Code, Section 951.

-13-

## MANNER AND MEANS

It was a part of the conspiracy that:

4.      Defendant ALI AMIRNAZMI, and others known and unknown to the grand jury, acted in the United States at the direction and control of various officials of the Government of Iran, including representatives of NPC and RIPI, to supply goods, technology, and services for these companies in exchange for hundreds of thousands of dollars and investments in joint ventures without obtaining the required OFAC approval.

5.      Defendant ALI AMIRNAZMI, and others known and unknown to the grand jury, coordinated their activities in the United States for the benefit of the Government of Iran and companies in Iran with officials of the Iranian Interests Section in Washington, D.C.

6.      Defendant ALI AMIRNAZMI, and others known and unknown to the grand jury, submitted to the direction and control of "Iranian Official #1" — a high-ranking official of the Government of Iran based in Iran who is known to the grand jury — and other representatives of the Iranian government based in Iran with respect to plans for AMIRNAZMI to conduct business in Iran for the benefit of Iran.

7.       Defendant ALI AMIRNAZMI, and others known and unknown to the grand jury, did not notify the Attorney General that defendant AMIRNAZMI would be acting in the United States as an agent of the Government of Iran.

## OVERT ACTS

In furtherance of this conspiracy, defendant ALI AMIRNAZMI and others known and unknown to the grand jury committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

-14-

1.     On or about November 26, 1996, defendant ALI AMIRNAZMI received a fax from an official of NPC asking defendant AMIRNAZMI to provide information about a bank account in Europe through which NPC could make payment to him.

2.     On or about August 6, 1997, defendant ALI AMIRNAZMI, as President of Trantech, signed a licensing agreement with NPC in Tehran, Iran, in which NPC agreed to pay thousands of dollars to Trantech for the use of the ChemPlan database and software system.

3.     In or about June 1999, defendant ALI AMIRNAZMI caused another individual to hand-deliver a ChemPlan software update and other materials to an NPC official in Iran.

4.     On or about August 1, 1999, defendant ALI AMIRNAZMI sent an electronic mail message to an official of NPC requesting an opportunity to brief NPC over two consecutive days on ChemPlan and other customized services offered for sale by Trantech.

5.     On or about August 5, 2000, defendant ALI AMIRNAZMI transmitted a fax to an NPC official located in Iran confirming that the official received computer software that defendant AMIRNAZMI had purchased and shipped to NPC in or about July 2000 at NPC's request.

6.     On or about July 30, 2004, defendant ALI AMIRNAZMI transmitted a letter from Devon to OFAC in which he stated that Trantech had been involved in only two transactions — which were unsuccessful attempts to transmit payments of $250 and $1,000, respectively — involving Iran since sanctions went into effect against Iran.

7.     In or about September 2006, defendant ALI AMIRNAZMI met in New York City with Iranian Official #1.

-15-

8.      In or about June 2007, defendant ALI AMIRNAZMI met in Iran with Iranian Official #1 and other representatives of the Iranian government regarding AMIRNAZMI's efforts to conduct business in Iran for the benefit of Iran.

9.      In or about August 2007, defendant ALI AMIRNAZMI entered an agreement with RIPI under which he agreed to conduct negotiations on RIPI's behalf with a Danish chemical company for the purpose of establishing a joint venture in Iran of which Trantech would receive a 10% share.

10.      In or about September 2007, defendant ALI AMIRNAZMI met in New York City with Iranian Official #1.

11.      In or about February 2008, defendant ALI AMIRNAZMI updated Iranian Official #1 on the progress of AMIRNAZMI's efforts to conduct business in Iran.

12.      On or about May 28, 2008, defendant ALI AMIRNAZMI, as President of Trantech, signed an agreement with NPC in Tehran, Iran, in which NPC agreed to pay at least $270,000 per year to Trantech for the use of the ChemPlan database and software system.

13.      On or about June 9, 2008, defendant ALI AMIRNAZMI used a calling card to call a representative of the Iranian Government from a payphone at a train station in Paoli.

14.      On or about June 13, 2008, after completing an interview with federal law enforcement officials, defendant ALI AMIRNAZMI left his home in Berwyn and used a calling card to call a representative of the Iranian Government from a payphone at a train station in Paoli.

All in violation of Title 18, United States Code, Section 371.

-16-

## COUNT SEVEN

(Illegal Agent of Government of Iran)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs One through Twelve and Overt Acts One through Sixteen of Count One of this superseding indictment, and Paragraphs One through Two and Four through Eight and Overt Acts One through Fourteen of Count Six of this superseding indictment, are all realleged here.

2.     At no time material to this superseding indictment was defendant ALI AMIRNAZMI: (a) a duly accredited diplomatic or consular officer of a foreign government, recognized by the United States Department of State; (b) an officially and publicly acknowledged and sponsored official or representative of a foreign government; or (c) an officially and publicly acknowledged and sponsored member of the staff of, or employee of, any such officer, official, or representative of a foreign government.

3.     From at least in or about 1996 through and including July 2008, in the Eastern District of Pennsylvania and elsewhere, defendant

**ALI AMIRNAZMI**

knowingly and intentionally acted in the United States as agent of a foreign government, specifically the Government of Iran, without prior notification to the Attorney General, as required by law, that is, (a) engaged with NPC in investments and transactions relating to or dealing in goods, technology, and services for sale and supply to NPC without obtaining the required OFAC approval; (b) engaged with RIPI in investments and transactions relating to or dealing in goods, technology, and services for sale and supply to negotiating transactions with

RIPI and a Danish chemical company without obtaining the required OFAC approval; (c)

conducted his activities in the United States on behalf of the Government of Iran and companies

in Iran in conjunction with representatives of the Iranian Interests Section in Washington, D.C.;

and (d) took steps to coordinate efforts to conduct business in Iran with Iranian Official #1 and

other representatives of the Iranian government based in Iran.

   In violation of Title 18, United States Code, Sections 951 and 2.

## COUNT EIGHT

(False Statements to Government Officials)

**THE GRAND JURY FURTHER CHARGES THAT:**

> 1.      Paragraphs One through Twelve and Overt Acts One through Sixteen of Count One of this superseding indictment, and Paragraphs One through Two and Four through Eight and Overt Acts One through Fourteen of Count Six of this superseding indictment, are all realleged here.

> 2.      On or about July 30, 2004, in the Eastern District of Pennsylvania and elsewhere, defendant

**ALI AMIRNAZMI,**

in a matter within the jurisdiction of the Department of the Treasury, an agency of the executive branch of the United States, knowingly and willfully falsified, concealed, and covered up material facts by trick, scheme, and device, and made materially false, fictitious, and fraudulent statements and representations in that, in a letter to an OFAC official, defendant ALI AMIRNAZMI concealed, covered up, and falsely represented Trantech's activities in Iran and with Iranian companies since such transactions became subject to United States sanctions.

In violation of Title 18, United States Code, Section 1001.

## COUNT NINE

(False Statements to Government Officials)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs One through Twelve and Overt Acts One through Sixteen of Count One of this superseding indictment, and Paragraphs One through Two and Four through Eight and Overt Acts One through Fourteen of Count Six of this superseding indictment, are all realleged here.

2.     On or about the morning of June 6, 2008, in Berwyn, in the Eastern District of Pennsylvania, defendant

**ALI AMIRNAZMI,**

in a matter within the jurisdiction of the Department of the Treasury, Internal Revenue Service, an agency of the executive branch of the United States, knowingly and willfully falsified, concealed, and covered up material facts by trick, scheme, and device, and made materially false, fictitious, and fraudulent statements and representations in that defendant ALI AMIRNAZMI falsely told a special agent of the Internal Revenue Service - Criminal Investigation Division that he did not sign any type of agreement during his most recent trip to Iran and that he has never engaged in any financial or other business transactions in Iran or anywhere else outside the United States.

In violation of Title 18, United States Code, Section 1001.

## COUNT TEN

(False Statements to Government Officials)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs One through Twelve and Overt Acts One through Sixteen of Count One of this superseding indictment, and Paragraphs One through Two and Four through Eight and Overt Acts One through Fourteen of Count Six of this superseding indictment, are all realleged here.

2.     On or about the evening of June 6, 2008, in Exton, in the Eastern District of Pennsylvania, defendant

**ALI AMIRNAZMI,**

in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the executive branch of the United States, knowingly and willfully falsified, concealed, and covered up material facts by trick, scheme, and device, and made materially false, fictitious, and fraudulent statements and representations in that defendant ALI AMIRNAZMI falsely told a special agent of the Federal Bureau of Investigation that he had made no agreements relating to business dealings with Iran, the government of Iran, or any entity associated with Iran.

In violation of Title 18, United States Code, Section 1001.

## COUNT ELEVEN

(Bank Fraud — Wachovia Bank)

**THE GRAND JURY FURTHER CHARGES THAT:**

        1.      At all times material to this superseding indictment, Wachovia Bank was a financial institution, with a branch located in Philadelphia, Pennsylvania, the deposits of which were insured by the Federal Deposit Insurance Corporation.

        2.      In or about October 2005, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendant

### ALI AMIRNAZMI

knowingly executed, and attempted to execute, a scheme to defraud Wachovia Bank, and to obtain monies owned by and under the care, custody, and control of Wachovia Bank by means of false and fraudulent pretenses, representations, and promises.

### THE SCHEME

        3.      In an application to Wachovia Bank for a loan of approximately $192,000, defendant ALI AMIRNAZMI supported the application's assertions of annual income with what purported to be a copy of a 2004 tax return that had been submitted to the IRS.  In fact, defendant AMIRNAZMI caused to be submitted to the bank a fake 2004 personal tax return reflecting an adjusted gross income of $134,907, whereas the 2004 personal tax return that defendant AMIRNAZMI actually caused to be submitted to the IRS reflected an adjusted gross income of $12,159.

        In violation of Title 18, United States Code, Section 1344.

## COUNT TWELVE

(Bank Fraud — Penn Liberty Bank)

**THE GRAND JURY FURTHER CHARGES THAT:**

   1. At all times material to this superseding indictment, Penn Liberty Bank was a financial institution, with a branch located in Wayne, Pennsylvania, the deposits of which were insured by the Federal Deposit Insurance Corporation.

   2. In or about December 2006, in Wayne, in the Eastern District of Pennsylvania and elsewhere, defendant

### ALI AMIRNAZMI

knowingly executed, and attempted to execute, a scheme to defraud Penn Liberty Bank, and to obtain monies owned by and under the care, custody, and control of Penn Liberty Bank by means of false and fraudulent pretenses, representations, and promises.

### THE SCHEME

   3. In an application to Penn Liberty Bank for a line of credit of approximately $30,000, defendant ALI AMIRNAZMI supported the application's assertions of annual income with what purported to be copies of 2004 and 2005 business and personal tax documents that had been submitted to the IRS. In fact, defendant AMIRNAZMI caused to be submitted to the bank several fake tax documents for those years. For example:

     a. Defendant AMIRNAZMI caused to be submitted to the bank a fake 2004 personal tax return reflecting an adjusted gross income of $106,661, whereas the 2004 personal tax return that defendant AMIRNAZMI actually caused to be submitted to the IRS reflected an adjusted gross income of $12,159.

b.      Defendant AMIRNAZMI caused to be submitted to the bank a fake 2004 Form 1120S for Trantech Consultants, Inc. reflecting ordinary business income of $202,203, whereas the actual 2004 Form 1120S submitted to the IRS reflected ordinary business income of -$33,630.

c.      Defendant AMIRNAZMI caused to be submitted to the bank a fake 2004 Schedule K-1, Form 1120S, from Trantech Consultants, Inc. for himself, reflecting ordinary business income of $141,542, whereas the actual 2004 Schedule K-1 submitted to the IRS reflected ordinary business income of -$23,541.

d.      Defendant AMIRNAZMI caused to be submitted to the bank a fake 2004 Schedule K-1, Form 1120S, from Trantech Consultants, Inc. for his wife, reflecting ordinary business income of $60,661, whereas the actual 2004 Schedule K-1 submitted to the IRS reflected ordinary business income of -$10,009.

e.      Defendant AMIRNAZMI caused to be submitted to the bank a fake 2005 personal tax return reflecting an adjusted gross income of $126,252, whereas the 2005 personal tax return that AMIRNAZMI actually caused to be submitted to the IRS reflected an adjusted gross income of -$107,533.

f.      Defendant AMIRNAZMI caused to be submitted to the bank a fake 2005 Form 1120S for Trantech Consultants, Inc. reflecting ordinary business income of $188,600, whereas the actual 2005 Form 1120S submitted to the IRS reflected ordinary business income of -$167,464.

g.      Defendant AMIRNAZMI caused to be submitted to the bank a fake 2005 Schedule K-1, Form 1120S, from Trantech Consultants, Inc. for himself, reflecting ordinary

-24-

business income of $132,020, whereas the actual 2005 Schedule K-1 submitted to the IRS reflected ordinary business income of -$117,225.

                h.       Defendant AMIRNAZMI caused to be submitted to the bank a fake 2005 Schedule K-1, Form 1120S, from Trantech Consultants, Inc. for his wife, reflecting ordinary business income of $56,580, whereas the actual 2005 Schedule K-1 submitted to the IRS reflected ordinary business income of -$50,239.

              In violation of Title 18, United States Code, Section 1344.

## COUNT THIRTEEN

(Bank Fraud — Penn Liberty Bank)

**THE GRAND JURY FURTHER CHARGES THAT:**

  1. At all times material to this superseding indictment, Penn Liberty Bank was a financial institution, with a branch located in Wayne, Pennsylvania, the deposits of which were insured by the Federal Deposit Insurance Corporation.

  2. In or about December 2007, Penn Liberty Bank notified defendant ALI AMIRNAZMI that it was reconsidering his continuing eligibility for the line of credit described in Count Twelve of this superseding indictment, and that the bank would render a final decision on this matter before on or about May 31, 2008.

  3. Between in or about December 2007 and in or about May 2008, Penn Liberty Bank notified defendant ALI AMIRNAZMI that, as part of this reconsideration process, he would need to cause an updated financial statement to be submitted to the bank.

  4. Between in or about December 2007 and in or about May 2008, in Wayne, in the Eastern District of Pennsylvania and elsewhere, defendant

### ALI AMIRNAZMI

knowingly executed, and attempted to execute, a scheme to defraud Penn Liberty Bank, and to obtain monies owned by and under the care, custody, and control of Penn Liberty Bank by means of false and fraudulent pretenses, representations, and promises.

### THE SCHEME

  5. In materials submitted to Penn Liberty Bank in connection with the bank's consideration of defendant ALI AMIRNAZMI's continuing eligibility for a line of credit

of approximately $30,000, defendant AMIRNAZMI supported the application's assertions of annual income with several fake tax documents.  For example:

        a.       Defendant AMIRNAZMI caused to be submitted to the bank a fake 2006 personal tax return reflecting an adjusted gross income of $41,297, whereas the 2006 personal tax return that defendant AMIRNAZMI actually caused to be submitted to the IRS reflected an adjusted gross income of -$71,803.

        b.       Defendant AMIRNAZMI caused to be submitted to the bank a fake 2006 Form 1120S for Trantech Consultants, Inc. reflecting ordinary business income of $25,528, whereas the actual 2006 Form 1120S submitted to the IRS reflected ordinary business income of -$107,572.

        c.       Defendant AMIRNAZMI caused to be submitted to the bank a fake 2006 Schedule K-1, Form 1120S, from Trantech Consultants, Inc. for himself, reflecting ordinary business income of $17,870, whereas the actual 2006 Schedule K-1 submitted to the IRS reflected ordinary business income of -$75,300.

        d.       Defendant AMIRNAZMI caused to be submitted to the bank a fake 2006 Schedule K-1, Form 1120S, from Trantech Consultants, Inc. for his wife, reflecting ordinary business income of $7,658, whereas the actual 2006 Schedule K-1 submitted to the IRS reflected ordinary business income of -$32,272.

        6.       In this financial statement, defendant AMIRNAZMI also failed to disclose to the bank his plans to relocate himself and/or his business to Iran in the near future.

        In violation of Title 18, United States Code, Section 1344.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT**:

   1. As a result of the violations of Title 50, United States Code, Section 1705, and Title 18, United States Code, Sections 371 and 1344 set forth in this superseding indictment, defendant

### ALI AMIRNAZMI

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offenses, including, but not limited to the sum of at least $1,000,000.

   2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

     (a) cannot be located upon the exercise of due diligence;

     (b) has been transferred or sold to, or deposited with, a third party;

     (c) has been placed beyond the jurisdiction of the Court;

     (d) has been substantially diminished in value; or

     (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), both incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture, including but not limited to the sum of $73,162.80, constituting proceeds from the sale of 547 Greenhill Lane, Berwyn, Pennsylvania, 19312, in or about August

2008, currently being held in the registry of the United States District Court for the Eastern

District of Pennsylvania.

All pursuant to Title 28, United States Code, Section 2461, and Title 18, United

States Code, Sections 981(a)(1)(C) and 982(a)(2).


**A TRUE BILL:**


_____
**GRAND JURY FOREPERSON**



_____
**LAURIE MAGID**
**ACTING UNITED STATES ATTORNEY**