**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL ACTION** |
| | ) | **NO.  08-CR-0429-01** |
| | ) | |
| **ALI AMIRNAZMI,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

<u>**MEMORANDUM OPINION & ORDER**</u>

**RUFE, J.**                                                                      **August 19, 2009**

On July 24, 2008, the Government filed an Indictment in this Court against Defendant Ali

Amirnazmi.[1]  The Indictment charged Defendant with ten counts, including one count of

conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"),[2] in

violation of 18 U.S.C. § 371; four substantive counts of violating IEEPA, in violation of 50

U.S.C. § 1705(c), and of aiding and abetting the same, in violation of 18 U.S.C. § 2; one count of

conspiracy to act as an illegal agent of a foreign government in violation of both the Foreign

Agents Registration Act ("FARA")[3] and 18 U.S.C. § 371; one substantive count of acting as an

illegal agent of a foreign government, in violation of 18 U.S.C. § 951, and of aiding and abetting

the same, in violation of 18 U.S.C. § 2; and three counts of making false statements to

government officials in violation of 18 U.S.C. § 1001.  A Superseding Indictment was filed on

October 2, 2008, charging Defendant with three additional counts of bank fraud in violation of 18

_____

[1] Indictment [Document No. 1].

[2] 50 U.S.C. § 1705.

[3] 18 U.S.C. § 951.

U.S.C. § 1344, and supplementing the original Indictment with further factual allegations.[4]

Following a jury trial, Defendant was convicted on February 13, 2009 of ten counts of the Superseding Indictment, including: one count of conspiracy to violate IEEPA,[5] in violation of 18 U.S.C. § 371; three substantive counts of violating IEEPA, in violation of 50 U.S.C. § 1705(c), and of aiding and abetting the same, in violation of 18 U.S.C. § 2; three counts of making false statements to government officials in violation of 18 U.S.C. § 1001; and three counts of bank fraud in violation of 18 U.S.C. § 1344.  Defendant now moves for a new trial pursuant to Federal Rule of Criminal Procedure 33.[6]  For the reasons that follow, the Court will deny Defendant's Motion.

## I.    STANDARD OF REVIEW

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[7]  The burden lies with the defendant to prove that a new trial should be granted.[8]  Yet, whether or not to grant a motion for a new trial is a decision "'committed to the sound discretion of the trial court.'"[9]  The grant of a new trial under Rule 33 is warranted if errors that occurred during trial, either individually or in combination, "'so infected the jury's deliberations that they had a

---

[4] Superseding Indictment [Document No. 36].

[5] 50 U.S.C. § 1705.

[6] Mot. for New Trial [Document No. 131] ("Def.'s Mot.").

[7] FED. R. CRIM. P. 33(a).

[8] United States v. Sass, 59 F.3d 341, 350 (2d Cir. 1995); see also 3 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 551 (3d ed. 2009).

[9] United States v. Fumo, No. 06-cr-319, 2009 WL 1688482, at *2 (E.D. Pa. June 17, 2009) (quoting United States v. Daniels, No. 95-cr-369, 1996 WL 311444, at *4 (E.D. Pa. June 6, 1996)).

substantial influence on the outcome of the trial.'"[10]  In other words, the district court will grant a

new trial only if a defendant proves (1) that error occurred at trial, and (2) that error had a

substantial influence on the verdict.[11]

## II.   DISCUSSION

Defendant argues that four errors occurred during trial that entitle him to a new trial,

including: (1) the admission of the tape recordings of Defendant's telephone calls from the

Federal Detention Center ("FDC"); (2) the admission of evidence relating to Defendant's

activities that occurred before July 24, 2003; (3) the Court's instruction to the jury on willful

blindness; and (4) the admission of Government Exhibit 500.[12]  As Defendant cannot

demonstrate that error occurred at trial, the Court will deny his Motion.

### A.    The Tape Recordings of Defendant's Telephone Calls

Defendant argues that the subpoenas issued by the Government to obtain the recordings

of Defendant's telephone conversations violated Rule 17(c) of the Federal Rules of Criminal

Procedure, as the Government's subpoenas did not satisfy the test set forth in United States v.

Nixon.[13]  The Court rejected this argument in its February 6, 2009 Order admitting the tape

---

[10] United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993) (quoting United States v. Hill, 976 F.2d 132, 145 (3d Cir. 1992)).

[11] Fumo, 2009 WL 1688482, at *2.

[12] Br. In Support of Def.'s Mot. for New Trial [Document No. 148] ("Def.'s Br.").

[13] 418 U.S. 683, 699 (1974).  In his Motion for a New Trial, Defendant also challenged the admission of the tape recordings claiming they were obtained in violation of the Wiretap Act.  (Pl.'s Mot. ¶ 1.)  Defendant, however, has abandoned this argument as he does not renew it in his brief filed in support of that Motion.  (See Def.'s Br.)  Therefore, the Court need not address this issue here.  Nevertheless, the Court notes that it also rejected this argument, and rests on its reasoning in its February 6, 2009 Order admitting the tape recordings.  (Order, February 6, 2009 [Document No. 100] at 2 n.1, 2.)

recordings.[14]   The test enumerated in Nixon applies only when a subpoena is issued seeking

production of materials prior to trial.[15]   The dates returnable of the subpoenas at issue

corresponded with trial dates in this matter.   Therefore, the Government did not seek pretrial

production of the tape recordings and the Nixon test is inapposite.   The Court also previously

rejected Defendant's argument that the Government improperly used trial subpoenas for

discovery.[16]   Defendant has given the Court no reason to reconsider its original ruling on this

matter, and the Court will decline to do so.   Thus, the Court did not err in admitting tape

recordings of Defendant's telephone conversations from the FDC,[17] and will not grant Defendant

a new trial on this ground.[18]

### B.        Statute of Limitations

The statute of limitations for violations of IEEPA is five years.[19]   Defendant argues that

his trial was tainted by the admission of evidence relating to his activities that occurred outside

the statute of limitations for violations of IEEPA, i.e. prior to July 25, 2003.[20]   Defendant

---

[14] Order, February 6, 2009 at 3 n.4.

[15] Nixon, 418 U.S. at 683; see also United States v. Cuthbertson, 630 F.2d 139, 144-45 (3d Cir. 1980) (applying the Nixon test to determine if subpoenaed materials must be produced weeks before trial).

[16] Order, February 6, 2009 at 3 n.4.

[17] See Gov't Exs. 78, 78T, 79, 79T, 82, 82T, 83, 83T, 84, and 84T.

[18] The probative value of these tape recordings lies in their value as evidence of Defendant's state of mind. Yet, the jury was presented with a plethora of other evidence from which Defendant's state of mind could be determined, including Defendant's repeated contradictory statements about his business dealings in Iran, and the multiple times he was put on notice of the restrictions on trade with Iran.   Therefore, even assuming the Court erred in admitting these tape recordings, such error would not have had a substantial impact on the verdict and would not warrant a new trial.

[19] See 18 U.S.C. § 3282(a).

[20] Def.'s Br. at 5.

contends that the Government offered no evidence at trial that Defendant's conduct before July 25, 2003 and his conduct after that date were part of a continuing course of conduct.[21]  The Court disagrees.

The Third Circuit defines conspiracy as "a continuing offense,"[22] and has held that a jury can consider all of defendant's actions in furtherance of a conspiracy so long as "the conspiracy, as contemplated in the agreement as finally formulated, was still in existence . . . [and] at least one overt act in furtherance of the conspiracy was performed" within the period of limitations.[23] Thus, "the crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy."[24]

Based on the evidence the Government presented at trial, Defendant's conduct prior to July 24, 2003 is closely tied to Defendant's continuing efforts to sell his ChemPlan software[25] to the National Petrochemical Company of Iran ("NPC").  The Government presented evidence that

---

[21] Id. at 5-6.

[22] United States v. Jake, 281 F.3d 123, 129 n.6 (3d Cir. 2002) (citing United States v. Johnson, 165 F.2d 42, 45 (3d Cir. 1947)).

[23] Grunewald v. United States, 353 U.S. 391, 397 (1957); see also Jake, 281 F.3d at 129 n.6.

[24] Grunewald, 353 U.S. at 397.

[25] Many of the exhibits presented by the Government refer to ChemPlan: OIC.  It appears that this refers to the version of ChemPlan that covers organic intermediate chemicals that was being marketed to NPC.  See Gov't Ex. 338 (letter from Defendant to Mrs. Parvaresh).

5

in 1997, Defendant signed an agreement with NPC to sell the ChemPlan software,[26] was paid for

the same[27] and even conducted demonstrations and training in Iran on the ChemPlan software.[28]

Evidence was also presented that sometime between 1998 and 1999, Defendant sold NPC an

update to the ChemPlan software.[29]  In 2000, Defendant strengthened his relationship with NPC

by assisting in the purchase and delivery of computer software at the request of NPC's Chief

Executive Office of Information Science Center, Mrs. Fatimeh Parvaresh, an NPC employee with

whom Defendant had consistent contact.[30]

      The evidence established that Defendant attended an international conference in Iran in

2000 where he met Mr. Payvandi, the Director of Planning and Development for NPC at the

time.[31]  On June 2, 2000, Defendant wrote Mr. Payvandi a letter referencing a May 27, 2000 fax

that included a subscription order form, a chemical list and prices for ChemPlan: OIC.[32]

---

[26] Gov't Ex. 333 (ChemPlan Software/Data License Agreement and ChemPlan OIC: Subscription Order Form signed by Defendant and Mansor Moazami, Director of Planning and Development at NPC on August 6, 1997).

[27] Gov't Ex. 356 (January 21, 1996 fax from Mrs. Fatimeh Parvaresh, an NPC engineer, to Defendant requesting payment information); Gov't Ex. 705 (September 25, 1997 bank receipt).

[28] Gov't Ex. 361T (August 12, 1997 letter confirming that Defendant was present at NPC for demonstrations and training in August of 1997).

[29] Gov't Ex. 521 (April 30, 1998 letter to Mrs. Parvaresh regarding ChemPlan price data); Gov't Ex. 525 (April 16, 1999 Invoice for ChemPlan: OIC Annual Update and Support); Gov't Ex. 520 (June 14, 1999 letter from Defendant to Mrs. Parvaresh regarding the delivery of ChemPlan: OIC database update).

[30] Gov't Ex. 363T (May 28, 2000 fax from Mrs. Parvaresh requesting that Defendant purchase Boxscore); Gov't Ex. 354 (June 2, 2000 fax from Defendnat to Mrs. Parvaresh asking questions about the Boxscore purchase, July 17, 2000 fax to Mr. Fallah regarding the shipment of Boxscore and payment instructions); Gov't Ex. 528 (August 4, 2000 Invoice to NPC for purchase of Boxscore); Gov't Ex. 354 (August 5, 2000 fax from Mrs. Pavaresh confirming NPC's receipt of Boxscore); Gov't Ex. 364T (August 7, 2000 fax from Mrs. Parvaresh regarding the invoice for Boxscore); Gov't Ex. 365T (August 10, 2000 fax to Mrs. Parvaresh regarding the invoice for Boxscore); Gov't Ex. 366T (March 31, 2001 fax regarding fourth quarter Boxscore being sent to Germany).

[31] Gov't Ex. 341 at 1.

[32] Id.

Moreover, the letter proposed several options for customizing ChemPlan for NPC, even suggesting the formation of a joint venture.[33]  The letter ended with Defendant recommending that NPC renew its subscription to ChemPlan: OIC.[34]

After attending the same conference in 2001, Defendant faxed a letter to Mrs. Ahmari on May 25, 2001 with an offer for a version of ChemPlan that would include the products of interest to NPC.[35]  In the letter, he referenced a May 8, 2001 meeting between Defendant, Mrs. Ahmari, Mrs. Parvaresh, Mr. Sanglagi and Mr. Ahmadian.[36]  He also attached subscription order forms for the Windows version of ChemPlan and ChemPlan: OIC.[37]  At the same time, Defendant also sent Mr. Payvandi a fax on May 28, 2001, discussing not only the 2001 conference, but also encouraging Mr. Payvandi to contact Defendant with respect to "our proposed SAP project."[38]  In July of 2002, Defendant continued his effort to drum up business in Iran by attempting to print promotional materials in Iran for his ChemPlan software.[39]

After Defendant's meeting with President Ahmadinejad on September 21, 2006, these efforts finally began to bear fruit.[40]  Defendant came to an agreement with the Institute for Business Analysis and Consultancy ("IBACO") to construct a Super Absorbent Polymer ("SAP")

---

[33] Id. at 1-3.

[34] Id. at 3.

[35] Gov't Ex. 343 at *1.

[36] Id. at *2.

[37] Id. at *8-*9.

[38] Gov't Ex. 346.

[39] See Gov't Ex. 701.

[40] See Gov't Ex. 370T.

plant in Iran.[41]  Moreover, on May 28, 2008, after months of negotiations, Defendant finally

convinced NPC to sign another license agreement for the Windows-based version of ChemPlan.[42]

It is also notable that Mr. Payvandi, Defendant's contact from the 2000 and 2001 conferences,

was very much involved in these later negotiations between Defendant and NPC.[43]  Moreover, in

a fax dated February 26, 2008, Defendant himself acknowledged that NPC's August 6, 1997

license agreement was still in effect.[44]

     In an April 30, 1998 letter, Defendant wrote that he hoped close cooperation between

himself and NPC would "make our country [Iran] an independent chemical powerhouse in the

World."[45]  In his own words, his hope was "to bring the expert system ChemPlan to Iran, train

young Iranians to learn the system and provide service to NPC, NIOC and the private chemical

sector and show the World through Internet [sic] what Iranians (not me) can do."[46]  Defendant

hoped to keep Iranian talent in Iran by returning and transferring his knowledge to a younger

---

[41] Gov't Ex. 222 (Emails with Mr. Shahmirzadi regarding the SAP project); Gov't Ex. 334 (May 31, 2008 agreement to construct a SAP plant signed by Defendnat and Mr. Shahmirzadi)

[42] Gov't Ex. 330A (ChemPlan Software/Data License Agreement for the Windows-based version signed on May 28, 2008 by Defendant and Seyed Abbas Alavi, General Manager for Legal Affairs at NPC); see also Gov't Ex. 372T at *1 (letter referencing June 12, 2007 meeting with NPC managers and the presentation of three proposals involving ChemPlan); Gov't Ex. 371T (June 22, 2007 proposal for the sale of ChemPlan); Gov't Ex. 709T (letter to Mr. Nejabat regarding the pricing for the ChemPlan system); Gov't Ex. 535T (May 2, 2008 letter to President Ahmadinejad regarding the extensive negotiations between Defendant and NPC).

[43] Gov't Ex. 372T at *2 (". . . we agreed to work with Engineer Payvandi on proposal 3A, complete sale of Houshmand *Chemplan* that needs a Super Computer); Gov't Ex. 709T (referencing a discussion with Engineer Payvandi and his suggestion for the presentation of the cost for the ChemPlan system).

[44] Gov't Ex. 600.

[45] Gov't Ex. 521 at 3.

[46] Gov't Ex. 206.

generation.[47]  He also hoped to lead a flow of Iranians back to Iran.[48]

Thus, the scope of Defendant's conspiracy was to bring his technical wherewithal, especially the ChemPlan system, back to Iran for the benefit of that country.  Key to accomplishing this goal was Defendant's efforts to sell the ChemPlan system to NPC.  He sold the ChemPlan software and an update to NPC in the late 1990's.  Most of his subsequent actions were aimed at maintaining NPC's business.  He strengthened his relationship with NPC by purchasing Boxscore in 2000 at the request of Mrs. Parvaresh, one of his key NPC contacts.  He also attended international forums in Iran where he made further contacts with NPC personnel, to whom he then marketed ChemPlan.  In July of 2002, Defendant attempted to print promotional material for ChemPlan in Iran.  Thus, prior to July 25, 2003, Defendant clearly worked to sell ChemPlan to NPC.  Moreover, he was also prior to July 25, 2003 working on a SAP project.

Although there is no evidence that his efforts yielded any results for a few years, Defendant was quick to take advantage of a meeting with President Ahmadinejad to advance his agenda.  With the President's support, Defendant was able to not only sign an agreement with IBACO to build a SAP plant, but also to sell NPC a new version of ChemPlan.  Prior to July 25, 2003, Defendant resolved on achieving certain goals for the betterment of Iran.  Both prior to and after July 25, 2003, he conspired with others and engaged in acts in furtherance of the same.  Although these goals were only accomplished after July 25, 2003, there is no evidence that Defendant ever abandoned or renounced them.  Thus, Defendant's conduct before and after July 25, 2003 was part of a continuing course of conduct, and the Court did not err in allowing the

---

[47] Gov't Ex. 547 at *2.

[48] Id.

9

jury to consider evidence of Defendant's conduct prior to that date.  The Court will not grant Defendant a new trial on this basis.

### C.      Willful Blindness Instruction

Defendant concedes that the Court gave the Third Circuit's standard jury charge on willful blindness with regard to the five IEEPA counts.[49]  He contends, however, that this instruction improperly dilutes the knowledge requirement, as it holds "the defendant liable simply for knowing 'something was amiss' rather than for deliberately avoiding inculpatory knowledge."[50]  In support of this contention, Defendant asserts that "the pattern instruction . . . permits the jury to find willful blindness 'if the evidence shows that there was a high probability that the defendant himself knew something was amiss and that he acted with deliberate disregard for a high probability that illegal activity was occurring.'"[51]  Yet, the instruction given by the Court did not include this language, and the Court is uncertain from what source Defendant is quoting.[52]  As the language to which Defendant objects was not used by the Court while

---

[49] Def.'s Br. at 8; see Third Circuit Model Criminal Jury Instructions § 5.06 (2008).

[50] Def.'s Br. at 10.

[51] Id.

[52] The Court instructed the jury on willful blindness as follows:

"Now to find Ali Amirnazmi guilty of willfully violating a license, order, or regulation issued pursuant to the International Emergency Economic Powers Act, you must find that the government proved beyond a reasonable doubt that he knew of the requirements of the relevant IEEPA regulations.

In this case, there is a question whether the defendant knew of the requirements of the relevant IEEPA regulations when as in this case, knowledge of a particular fact or circumstance is an essential part of the offense charged.  The government may prove that Amirnazmi knew of that fact or circumstance if the evidence proves beyond a reasonable doubt that he deliberately closed his eyes to what would otherwise have been obvious to him.

No one can avoid responsibility for a crime by deliberately ignoring what is obvious.  Thus, you may find that Amirnazmi knew of the requirements of the relevant IEEPA regulations based on evidence

instructing the jury, the Court is unpersuaded by Defendant's argument.

Defendant also argues that the Court should not have given the willful blindness instruction because there "is no evidence in the record, nor was there any defense made, of any claim by Dr. Amirnazmi at any time that he was not aware of the IEEPA regulations or he believed they did not exist."[53]  The Court must agree with the Government that Defendant himself put at issue whether or not he "subjectively believed that his conduct was protected under the 'informational materials' exemption of IEEPA."[54]  Thus, the Court properly gave the Third Circuit pattern instruction regarding willful blindness, and Defendant is not entitled to a new trial.

### D.    Government Exhibit 500

At trial, Defendant objected to the admission of Government Exhibit 500, arguing that it was irrelevant and unfairly prejudicial under Federal Rule of Evidence 403.  The Court admitted the exhibit over Defendant's objection finding that the exhibit "does show defendant's supposed

---

which proves that, 1, he was aware of a high probability of these requirements and 2, he consciously and deliberately tried to avoid learning about these requirements.

You may not find that he knew of the requirements of the relevant IEEPA regulations if you find that the defendant actually believed that these requirements did not exist.  Also, you may not find that he knew of the requirements of the relevant IEEPA regulations.  If you find only that he should have known of these requirements or that a reasonable person would have known of a high probability of these requirements.

It is not enough that he may have been stupid or foolish, or may have acted out of inadvertence or accident. You must find that he was actually aware of a high probability that there were requirements in the relevant IEEPA regulations, deliberately avoided learning about them, and did not actually believe that they did not exist."

Trial Tr., February 12, 2009 [Document No. 160] ("2/12/09 Tr.") at 149:5-150:18.

[53] Def.'s Br. at 11.

[54] Gov't's Resp. to Def.'s Mot. for a New Trial [Document No. 153] ("Gov't Resp.").

motives as well as his frame of mind."[55]  The Court required that the document be redacted and did not allow any reference to Defendant's marital difficulties.[56]  Defendant continues to argue that the document was admitted in error because it is irrelevant and its potential for unfair prejudice outweighed its probative value.  The Court disagrees.

As a general rule, relevant evidence is admissible.[57]  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[58]  This is a very low threshold of admissibility.[59]  Yet, even if evidence is relevant, it may still be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[60]

Government Exhibit 500 is a letter in which Defendant details his loyalty to Iran, his lack of respect for the United States government and his continued support of Iran.  Defendant argues that this letter was taken out of context, as it was written to his wife's attorney in the midst of divorce proceedings.  Yet, a key issue in this case was whether Defendant acted with criminal intent.  As the letter does make it more likely that Defendant acted with criminal intent, it is certainly relevant under Federal Rule of Evidence 402.  Moreover, the probative value of this

---

[55] Trial Tr., February 6, 2009 [Document No. 139] ("2/6/09 Tr.") at 113:16-18..

[56] Id. at 112:20-23, 115:5-8, 117:16-20.

[57] FED. R. EVID. 402.

[58] FED. R. EVID. 401.

[59] Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc., 797 F.2d 1222, 1244 (3d Cir. 1986).

[60] FED. R. EVID. 403.

letter was magnified by Defendant's vigorous opposition to the Government's proof of his state of mind, especially given that the letter is in Defendant's own words.  Thus, the probative value of Government Exhibit 500 is not substantially outweighed by its potential for unfair prejudice. As the Court did not err in admitting Exhibit 500, Defendant is not entitled to a new trial on this ground.

An appropriate Order follows.