**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL ACTION** |
| | ) | **NO.  08-CR-0429-01** |
| | ) | |
| **ALI AMIRNAZMI,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION & ORDER

**RUFE, J.**                                                                 **August 21, 2009**

Following a jury trial on February 13, 2009, Defendant was convicted of ten counts of a Superseding Indictment, including: Count One, conspiracy to violate IEEPA, in violation of 18 U.S.C. § 371; Counts Two, Four and Five, violations of IEEPA, in violation of 50 U.S.C. § 1705(c), and of aiding and abetting the same, in violation of 18 U.S.C. § 2;[1] Counts Eight through Ten, false statements to government officials in violation of 18 U.S.C. § 1001;[2] and Counts Eleven through Thirteen, bank fraud in violation of 18 U.S.C. § 1344.[3]  Defendant now moves for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 on Counts

---

[1] Defendant was convicted of Count Two for violating or attempting to violate IEEPA by engaging in transactions with National Petrochemical Company of Iran ("NPC").  Count Four involved transactions with the Institute for Business Analysis and Consultancy ("IBACO"), while Count Five covered transactions with the Nokhbegan Institute of Technology Development ("NITD").

[2] Defendant was convicted of Count Eight involving his communications with the Office of Foreign Asset Control ("OFAC") on or about July 30, 2004.  Count Nine involved his communications on the morning of June 6, 2008 with Special Agent Christopher Hueston of the Internal Revenue Service ("IRS"), whereas Count Ten relates to Defendant's communications on the evening of June 6, 2008 with Special Agent Karen McAllister of the Federal Bureau of Investigation ("FBI").

[3] Defendant was convicted of Count Eleven for defrauding Wachovia Bank in October 2005.  Count Twelve and Thirteen involved the defrauding of Penn Liberty Bank in December 2006 and December 2007, respectively. Defendant did not move for a judgment of acquittal on Counts Twelve and Thirteen.  Thus, these counts of conviction are not at issue here.

One, Two, Four, Five, Eight, either Nine or Ten, and Eleven.[4]  For the reasons that follow, the

Court will deny Defendant's Motion.[5]

I.    **UNCONSTITUTIONAL DELEGATION**

Defendant asserts that IEEPA and the IEEPA regulations constitute an unconstitutional

delegation of Congress's legislative authority to the executive branch.[6]  As a result, Defendant

urges that he is entitled to judgment of acquittal on all of the IEEPA charges, including Counts

One, Two, Four and Five.  Defendant argues that IEEPA delegates unbridled discretion to the

Executive to promulgate regulations amounting to criminal laws without providing "intelligible

principles" upon which to base the same.[7]  The Court rejected this argument in its January 5,

2009 Memorandum Opinion and Order denying Defendant's motion to dismiss these charges

from the Indictment prior to trial.[8]  The Court finds no reason to reconsider its prior ruling and

will rest on the reasoning therein.  Thus, the Court will not grant Defendant a judgment of

acquittal on Counts One, Two, Four and Five on this basis.

II.   **UNCONSTITUTIONALLY VAGUE**

Defendant argues that he should also be granted judgment of acquittal on the IEEPA

---

[4] Mot. for J. of Acquittal [Document No. 130] ("Def.'s Mot."), see also Br. in Support of Def.'s Mot. for J. of Acquittal [Document No. 150] ("Def.'s Br.").  Under Federal Rule of Criminal Procedure 29, a defendant "may move for a judgment of acquittal, or renew such a motion within 7 days after a guilty verdict."  FED. R. CRIM. P. 29(c)(1).  "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  FED. R. CRIM. P. 29(c)(2).  Defendant filed a timely motion for judgment of acquittal and the Court will address each of his arguments in turn.

[5] Defendant also filed a Motion for a New Trial (Document No. 131), which the Court denied in a Memorandum Opinion and Order on August 19, 2009 (Document Nos. 165 and 166).

[6] Def.'s Br. at 3.

[7] Id. at 3-7.

[8] Mem. Op. and Order, January 5, 2009 [Document No. 77] at 5-7.

changes because the IEEPA regulations issued and administered by OFAC are void for vagueness.  Defendant contends that the IEEPA regulations did not give him notice that ChemPlan was not exempt from the Iranian trade embargo as informational materials, nor did they give him notice that he had to obtain a license from OFAC to engage in the business activities that he did.[9]

A criminal statute or regulation is unconstitutionally vague and violates the Due Process Clause of the Fifth Amendment if "it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden."[10]  Yet, "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."[11]  "Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process."[12]

Here, the IEEPA regulations restricting trade with Iran "govern the activities of relatively sophisticated individuals who are deliberately engaged in international commerce and, therefore, must be familiar with (if not expert in) various legal regimes . . . in multiple countries."[13]  Thus, there is no concern that the IEEPA regulations will "sweep within their coverage the everyday acts of average citizens."[14]  In addition, the licensing department of OFAC administers the

---

[9] Def.'s Br. at 11-14.

[10] Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972).

[11] Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982).

[12] Id.

[13] United States v. Quinn, 401 F. Supp. 2d 80, 100 (D.D.C. 2005).

[14] Id.; cf. Papachristou, 405 U.S. at 158 (finding a vagrancy law unconstitutionally vague).

process by which businesses and natural persons can apply for a license or request a letter providing interpretative guidance.[15]  Moreover, OFAC has an electronic and a telephone hotline that can be contacted with questions regarding the IEEPA regulations.[16]  In light of the narrow subject matter and reach of the IEEPA regulations, as well as the sophisticated nature of the persons they affect and the ability of such persons to obtain guidance from OFAC itself, the IEEPA regulations are not unconstitutionally vague.[17]

Moreover, the underlying statute at issue includes a scienter requirement requiring the Government to prove beyond a reasonable doubt that a criminal defendant acted willfully.[18]  "In other words, this is a case where ignorance of the law *is* a defense; the inability to appreciate the meaning of the law negatives the *mens rea* required for conviction," and Defendant was free to, and did, argue this to the jury.[19]  The Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.[20]  "[W]here the punishment imposed is only for an act

---

[15] Trial Tr., February 9, 2009 [Document No. 141] ("2/9/09 Tr.") at 220:18-21.

[16] Id. at 245:3-6.

[17] The Court notes that Defendant himself contacted OFAC several times.  Yet, it does not appear that he did so in good faith or with the intention of actually procuring guidance in complying with the OFAC regulations. (See id. at 224:24-229:19, 249:8-250:21; see also Gov't Trial Exs. 46, 47, 102.)

[18] IEEPA states, in pertinent part that "[w]hoever *willfully* violates, or *willfully* attempts to violate, any license, order or regulation issued under this title shall, upon conviction, be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than ten years, or both . . . ."  50 U.S.C. § 1705(b) (emphasis added).

[19] Quinn, 401 F. Supp. 2d at 100-01 (emphasis in original).

[20] Vill. of Hoffman Estates, 455 U.S. at 499; see also United States v. Ragen, 314 U.S. 513, 524 (1942) ("A mind intent on willful evasion is inconsistent with surprised innocence); United States v. Anvari-Hamedani, 378 F. Supp. 2d 821, 831 (N.D. Ohio 2005) (citing United States v. Hescorp, Heavy Equip. Sales Corp., 801 F.2d 70, 77 (2d Cir. 1986) (finding that a requirement of specific intent "makes a vagueness challenge especially difficult to sustain")).

knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of the law."[21]  Hence, IEEPA's requirement of specific intent further alleviates any concern that Defendant was convicted under a law that he could not have reasonably understood.  As IEEPA and its regulations are not unconstitutionally vague, the Court denies Defendant's Motion for a judgment of acquittal on Counts One, Two, Four and Five on this basis.

## III.   MULTIPLICITY OF COUNTS NINE AND TEN

Defendant also seeks judgment of acquittal on either Count Nine or Count Ten, arguing that the two counts are multiplicitous.  Defendant previously moved to dismiss one of these two counts prior to trial,[22] but the Court denied that motion without prejudice, finding that the issue was better resolved afterwards.[23]

At trial, both Special Agent Hueston of the IRS and Special Agent McAllister of the FBI testified that on the morning of June 8, 2008, they interviewed Defendant together at his residence.[24]  According to their testimony, Defendant told them that his most recent trip to Iran was to visit his mother and to attend a petrochemical forum.[25]  They testified that Defendant told them he had not signed any agreements regarding business in Iran, either on his most recent trip to Iran or at any time in the past.[26]  They also stated that Defendant denied to them that he had

---

[21] Screws v. United States, 325 U.S. 91, 102 (1945).

[22] Def.'s Mot. to Dismiss Counts Nine and Ten of Superseding Indictment [Document No. 63].

[23] Mem. Op. and Order, January 5, 2009 at 9-10.

[24] 2/9/09 Tr. at 78:13-23; Trial Tr., February 10, 2009 [Document No. 143] ("2/10/09 Tr.") at 164:2-11.

[25] 2/9/09 Tr. at 83:24-84:2; 2/10/09 Tr. at 165:7-15.

[26] 2/9/09 Tr. at 82:9-83:16; 2/10/09 Tr. at 167:12-25.

ever conducted business meetings in Iran.[27]

  Special Agent McAllister testified that after their morning interview of Defendant, she obtained a search warrant for not only Defendant's residence, but also his office in Exton, Pennsylvania.[28]   The search warrant was executed later that day.[29]   Special Agent McAllister joined the search of Defendant's office, at which Defendant was present.[30]   She told Defendant "that agents were looking for any documents or materials relating to any business dealings in Iran, the government of Iran or any entities associated with Iran."[31]   He responded that there were no such documents.[32]   When Special Agent McAllister reminded him that he had said that morning that he had drafted but not signed such a document, he replied that they were on his laptop which had been seized by Customs and Border Protection in Detroit.[33]   Upon being informed that they were going to continue their search, Defendant offered to pull up the requested information on an office computer.[34]   Special Agent McAllister also testified that because of Defendant's continuing lies, she was forced to keep surveillance on him, review and analyze all of the documents seized and have all of the documents written in Farsi translated.[35]

---

[27] 2/9/09 Tr. at 84:3-16; 2/10/09 Tr. at 165:16-166:4.

[28] 2/10/09 Tr. at 168:15-24.

[29] Id. at 169:5-7.

[30] Id. at 169:8-14.

[31] Id. at 170:18-22.

[32] Id. at 170:24-171:2.

[33] Id. at 171:3-20.

[34] Id. at 171:21-172:5.

[35] Id. at 175:1-176:8.

Defendant argues that because Agent McAllister was present during Agent Hueston's interview of Defendant, Counts Nine and Ten are therefore multiplicitous.  Defendant advocates that the Court adopt a test used by other circuits allowing separate violations for identical false statements under 18 U.S.C. § 1001 only if (1) the declarant was asked the same question and gave the same answer; and (2) the later false statement further impaired the operations of the government.[36]  Yet, the first flaw with Defendant's logic is that he did not give identical false statements.  As the testimony at the trial clearly demonstrates, Defendant was not asked the same question nor did he give the same answer on the morning of June 6, 2008 as compared to the evening of that same day.  When he was interviewed by Special Agent Hueston and Special Agent McAllister, Defendant made false statements relating to the purpose of his most recent trip to Iran, whether he had ever had business meetings in Iran and whether he had signed any agreements regarding business in Iran.  In contrast, on the evening of June 6, 2008, Defendant made false statements as to the existence and location of documents relating to his business dealings in Iran.  Hence, Defendant is not entitled to a judgment of acquittal on Count Nine or Count Ten, even under the test he advances, so the Court need not decide whether to adopt it.

Furthermore, Special Agent McAllister testified how Defendant's lying further impaired their investigation, forcing the investigating agents to review the many documents by themselves and to verify independently anything told to them by Defendant.  Thus, Count Nine and Count Ten are not multiplicitous as the false statements underlying the two counts were not identical and the later statement did further impair the Government's investigation of Defendant.  As

---

[36] United States v. Wu, 419 F.3d 142, 147 (2d Cir. 2005) (citing United States v. Roshko, 949 F.2d 9, 12 (2d Cir. 1992)); United States v. Stewart, 420 F.3d 1007, 1013 (9th Cir. 2005); United States v. Trent, 949 F.2d 998, 1000 (8th Cir. 1991); United States v. Olsowy, 836 F.2d 439, 443 (9th Cir. 1987).

Defendant advances no other theory under which he should be granted a judgment of acquittal on these counts, the Court will not grant him the same.

## IV.  SUFFICIENCY OF THE EVIDENCE

Finally, Defendant challenges the sufficiency of the evidence supporting his conviction on Counts One, Two, Four, Five, Eight and Eleven.  The Court must "apply a particularly deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence."[37]  It cannot "weigh the evidence or determine the credibility of the witness[es]."[38]  Rather, the Court must "view the evidence in the light most favorable to the government, and . . . sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[39]  A "'claim of sufficiency of the evidence places a very heavy burden'" on a defendant.[40]

### A.     Informational Materials Exemption

Defendant claims he is entitled to judgment of acquittal on Counts One, Two, Four and Five because of IEEPA's informational materials exemption.  The information materials exemption in the IEEPA statute makes the following not illegal:

> The importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs,

---

[37] United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998).

[38] United States v. Jones, 566 F.3d 353, 361 (3d Cir. 2009); see also Dent, 149 F.3d at 187 (quoting United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir. 1996)).

[39] Dent, 149 F.3d at 187 (internal citations and quotation marks omitted).

[40] Id. (quoting United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990)).

artworks, and newswire feeds.[41]

This exemption is limited by the IEEPA regulations as follows:

> This section does not exempt from regulation or authorize transactions related to information and informational materials not fully created and in existence at the date of the transactions, or to the substantive or artistic alteration or enhancement of informational materials, or to the provision of marketing and business consulting services. Transactions that are prohibited notwithstanding this section include, but are not limited to, payment of advances for information and informational materials not yet created and completed (with the exception of prepaid subscriptions for widely circulated magazines and other periodical publications), and provision of services to market, produce or co-produce, create or assist in the creation of information and informational materials.[42]

Defendant agreed to the jury being instructed with this language from the IEEPA statute and regulations.[43] Defendant argues that the Government failed to prove beyond a reasonable doubt that the information materials exemption did not apply to Defendant's charged conduct.

Defendant does not argue that the informational materials exemption applies to building chemical plants in Iran.[44] Nor does Defendant contend that the exemption encompasses the hiring of personnel to work in Iran. The Government produced evidence which if viewed in the light most favorable to the Government could lead a reasonable factfinder to believe that Defendant's transactions with IBACO included the building of physical plants in Iran[45] and the hiring of an engineer.[46] Thus, even if ChemPlan were covered by the informational materials

---

[41] 50 U.S.C. § 1702(b)(3).

[42] 31 C.F.R. § 560.210(c)(2).

[43] Trial Tr., February 12, 2009 [Document No. 160] ("2/12/09 Tr.") at 105:11-15, 111:4-112:21.

[44] Defendant admitted this to Special Agent Hueston.  (See 2/9/09 Tr. at 86:20-23.)

[45] See Gov't Trial Exs. 300, 334, 507, 508.

[46] Gov't Trial Ex. 217.

exemptions, Defendant would still not be entitled to a judgment of acquittal on Counts One and Four.

     With regard to ChemPlan, the Record contains evidence of the nature of the product Defendant was selling.  The jury heard testimony from Ms. Estelle Tracy, who was the Marketing Manager and then the Director of Marketing for Defendant's company.[47]  She described ChemPlan as a database and a planning tool.[48]  According to Ms. Tracy, ChemPlan's database contained the recipes for a wide variety of chemicals.[49]  She testified that these recipes were derived from publicly available information, and from proprietary data that Defendant used his chemical wherewithal to extract.[50]  Ms. Tracy also stated that ChemPlan included a planning tool that "allowed the user to study the impact of different parameters on something like production costs to make your chemical."[51]  Ms. Tracy testified that a user of ChemPlan could enter his or her own data into ChemPlan and it would produce customized reports.[52]

     The jury also heard testimony from Joseph Mehl that ChemPlan "was developed using FoxPro database relational database management system to provide end users with . . . chemical processing information."[53]  Mr. Mehl stated that to his knowledge, "each [ChemPlan] package that was sold was specifically tailored to the end user, depending on what industry they worked

---

[47] 2/9/09 Tr. at 51:17, 52:23-25, 58:23, 59:11-14, 63:23-24.

[48] Id. at 54:10-12.

[49] Id. at 54:13-17, 55:8-15.

[50] Id. at 54:18-55:7.

[51] Id. at 56:2-13.

[52] Id. at 56:14-57:12.

[53] Trial Tr., February 11, 2009 [Document No. 145] ("2/11/09 Tr.") at 93:7-10.

in."[54]  Defendant himself described ChemPlan as "a dynamic tool, which allows the user to generate 'what if' scenarios."[55]

    With respect to evidence of what is permitted under the informational materials exemption of the IEEPA regulations, the jury heard testimony from Ms. Rafi Crocket, a former OFAC Compliance Officer, as to her understanding that software did not qualify as informational materials.[56]  She also stated that the information and informational materials that were not prohibited from being imported and exported between the United States and Iran were "things that are already in existence."[57]  Special Agent Hueston testified that Defendant explained to him that the IEEPA did not prohibit the sharing of informational materials, such as information that was publicly available and could be found in a library.[58]  Finally, Mr. Eric Von Vorys testified pursuant to a subpoena Defendant served on Sanford Research Institute ("SRI") Consulting.[59]  Mr. Von Vorys testified on cross examination that the materials SRI Consulting had sold to Iranian companies pursuant to the information materials exemption existed in fixed form,[60] could not be changed[61] and contained no software or technology.[62]

---

[54] Id. at 93:13-14.

[55] Gov't Trial Ex. 545 at *1.

[56] 2/9/09 Tr. at 224:12-23.

[57] Id. at 223:23-224:4.

[58] Id. at 86:12-19.

[59] 2/11/09 Tr. at 152:15-19, 161:11-12.

[60] Id. at 161:13-22.

[61] Id. at 162:9-17.

[62] Id. at 163:15-164:11.

Viewing the evidence in the light most favorable to the Government, a reasonable factfinder could find that the Government had proven beyond a reasonable doubt that ChemPlan was "not fully created and in existence at the date of the [relevant] transactions."[63]  Hence, a reasonable factfinder could have found that the informational materials exemptions did not apply to Defendant's actions.  Therefore, Defendant is not entitled to a judgment of acquittal on Counts One, Two, Four and Five on this basis.

### B.      Trigger of License Requirement

Defendant argues that he is entitled to judgment of acquittal on Counts Four and Five.[64] He asserts that the Government failed to establish beyond a reasonable doubt that the IEEPA regulations require a license in order to conduct the preliminary business activities prior to the final contract that encompassed his dealings with IBACO and NITD.[65]

The IEEPA regulations require a license before engaging "in any transaction or dealing in or related to (1) Goods or services of Iranian origin or owned or controlled by the Government of Iran; or (2) Goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran."[66]  The regulations also broadly define the term "transaction or dealing" to include but not limited to "purchasing, selling, transporting,

---

[63] Id.

[64] Although Defendant's arguments in his brief mentions NPC in passing, Defendant only seeks a judgment of acquittal on Counts Four and Five on the basis of this argument.  Thus, the Court will not address NPC and Count Two herein.  The Court does note, however, that the evidence of the sale of ChemPlan to NPC in the late 1990s, as well as Defendant's procurement of Boxscore would have been sufficient to deny any motion for a judgment of acquittal on Count Two on this ground.

[65] Def.'s Br. at 9.

[66] 31 C.F.R. § 560.206(a).

12

swapping, brokering, approving, financing, facilitating, or guaranteeing."[67]

Defendant's argument misconstrues the Government's burden. The IEEPA regulations require a license not based on whether the conduct occurs prior to or after the execution of a final contract, but rather based upon the nature of the conduct itself. Hence, the Government need not prove that the IEEPA regulations require a license before Defendant could engage in preliminary activities. Instead, the Government must show beyond a reasonable doubt that Defendant engaged in activities the nature of which required a license under the IEEPA regulations.

Here, the Government produced abundant evidence that Defendant engaged in extensive negotiations with IBACO regarding the building of a Polyvinylbutyral ("PVB") and a Super Aborbent Polymer ("SAP") plant in Iran. The Government submitted a memorandum of understanding ("MOU") as to the PVB Project signed in December 2007 by Defendant and Mr. Shahmirzadi, the Managing Director of IBACO.[68] The Government also produced several e-mails from Defendant to Mr. Shahmirzadi discussing the two projects.[69] In one of the e-mails, Defendant writes to Mr. Shahmirzadi that he was taking steps to secure a chemical engineer to handle the PVB project.[70] The Government put forth minutes from meetings on April 23, 2008 and May 20, 2008 between Defendant and IBACO representatives involving the PVB project.[71] Finally, the Government produced at trial an agreement for the construction of the SAP plant

---

[67] 31 C.F.R. § 560.206(b).

[68] Gov't Trial Ex. 300.

[69] See Gov't Trial Exs. 210, 217, 222.

[70] Gov't Trial Ex. 217.

[71] Gov't Trial Exs. 538, 539.

signed by Defendant and Mr. Shahmirzadi on May 31, 2008.[72]  There was sufficient evidence for

a reasonable factfinder to find that Defendant engaged in brokering, approving, facilitating or

guaranteeing while engaging in business activities with IBACO.  Thus, a reasonable factfinder

could have found that Defendant required a license from OFAC for the same.

       With respect to NITD, the Government submitted as evidence a MOU signed on May 2,

2008 by Defendant and Seyed H. Dabaghian, the president of NITD.[73]  The purpose of the MOU

was to create a joint venture company.  The MOU listed responsibilities and obligations of each

party.  NITD's obligations and responsibilities included gathering information, as well as

evaluating the feasibility and cost of the joint venture.  The obligations of Defendant's company

included evaluating how to transfer chemical software to Iran, submitting its United States

business tax returns for previous years, and agreeing "not to transfer part or all of software and

data base rights to third party during the MOU term."[74]  Here too, there is sufficient evidence for

a reasonable factfinder to find that Defendant engaged in swapping, brokering, approving,

facilitating and guaranteeing when he engaged in business activities with NITD.  And again, a

reasonable factfinder could have found that Defendant required a license from OFAC for the

same.

       A reasonable factfinder could have found that the Government proved beyond a

reasonable doubt that Defendant required a license before engaging in the business activities with

---

[72] Gov't Trial Ex. 334.  The Court notes that Defendant's argument is premised on the fact that all of his business activities were preliminary in nature, as in prior to a final contract.  Based on this exhibit, a reasonable factfinder could have found that Defendant actually did sign a final contract with IBACO.  Thus, even if the Court had accepted Defendant's argument, he would still not be entitled to a judgment of acquittal on Count Four.

[73] Gov't Trial Ex. 329.

[74] Id. at *2.

IBACO and NITD that he did.  Therefore, Defendant is not entitled to a judgment of acquittal on Count Four or Count Five, and the Court denies his Motion for the same.

### C.      Intent in Count Eight

Defendant contends that he is also entitled to judgment of acquittal on Count Eight relating to his July 30, 2004 letter to OFAC.  Defendant mistakenly contends that the sole evidence the Government produced as to this count was a copy of that July 30, 2004 letter.[75] Defendant makes much of his statement in that letter that he had lost the correspondence from OFAC to which he was responding, arguing that given that statement, the Government did not prove beyond a reasonable doubt that he acted willfully or knowingly in making false statements to OFAC.[76]  The Government submitted at trial a June 30, 2004 letter from OFAC which appears to be the communication to which Defendant was responding.[77]  That letter was discovered in file cabinets that Defendant's wife had moved from Defendant's office to a storage unit.[78]  Thus, a reasonable factfinder could determine that even the statement that he had lost the June 30, 2004 communication from OFAC was false.

Assuming that the jury did believe that Defendant had lost the June 30, 2004 letter from OFAC, there was still sufficient evidence from which the jury could determine that Defendant wilfully and knowingly made false statements to OFAC in his July 30, 2004 letter.  In determining whether Defendant acted with the necessary *mens rea*, the jury was free to consider

---

[75] Gov't Trial Ex. 46.

[76] Def.'s Br. at 15-16.

[77] Gov't Trial Ex. 102.

[78] 2/10/09 Tr. at 184:5-187:3.

all the facts and circumstances shown by the evidence that may prove what was in his mind at the time.  Viewing the evidence in the light most favorable to the Government, the Record is replete with evidence from which a reasonable factfinder could determine that Defendant knew of the IEEPA regulations,[79] that he went to great lengths to disguise his violations of the same[80] and that this instance was another example of that same behavior.  Furthermore, the Government produced evidence at trial that Defendant had previously lied to OFAC regarding the fee to attend an Iranian petrochemical conference in 2000.[81]  Hence, there was sufficient evidence for a jury to find Defendant guilty of each element of Count Eight beyond a reasonable doubt, and Defendant is not entitled to a judgment of acquittal on this count.

### D.       Materiality in Count Eleven

Defendant claims he is entitled to judgment of acquittal on Count Eleven because the Government failed to prove that Defendant's false or fraudulent representations were material to Wachovia Bank's decision to approve Defendant's loan.  A false statement is material if it has "'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'"[82]  Defendant agreed that the jury be instructed

---

[79] See, e.g., Gov't Tr. Ex. 399 (fax from Summit Bank noting that Defendant was in violation of the OFAC regulations and with portions of the regulations attached); 2/9/09 Tr. at 85:11-87:18.

[80] For example, the Government produced testimony demonstrating that Defendant lied to Customs and Border Control officers at airports to conceal his business dealings in Iran.  (Trial Tr., February 6, 2009 [Document No. 139] ("2/6/09 Tr.") at 5:19-20, 13:12-14:11, 27:1-4, 28:25-29:5, 33:17-18, 43:3-7, 44:7-14, 94:8-23, 97:11-18, 98:11-99:2, 100:17-24.)  There was also a recording of Defendant ordering his sister to tell people from IBACO, NPC and RIPI to not talk to the Government.  (Gov't Trial Ex. 83.)  Finally, the Government produced evidence that after Defendant's attempt to wire funds was stopped in 2001, Defendant found ways to prevent OFAC from detecting his subsequent activities.  (See Gov't Trial Exs. 305, 311.)

[81] See Gov't Trial Exs. 304, 305; 2/9/09 Tr. at 87:19-88:1.

[82] Id. at 16 (quoting United States v. Gaudin, 515 U.S. 506, 509 (1995)).

16

that a material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision on whether or not to extend a loan or line of credit to the defendant.[83]

At trial, the Government called David Sweeney, Vice Presidential of Commercial Lending for Penn Liberty Bank, to testify.[84]  Mr. Sweeney testified that his bank requested Defendant's personal and business tax returns in order assess the risk it was taking in making a loan to Defendant.[85]  Mr. Sweeney also stated that he based his decision to make the loan to Defendant based upon "what he was showing as income on his tax returns."[86]  Most significantly, Mr. Sweeney stated that in general, the supporting documents submitted with a loan application are extremely important and that the bank bases its whole decision on the same.[87]  Finally, Mr. Sweeney testified that it would have been important to his decision to know that Defendant had reported negative income in the tax returns he submitted to the IRS.[88]

The Government also called Todd Tucker, a loan officer from Alliance Bank, to testify.[89] Mr. Tucker stated that Alliance Bank bought Defendant's loan from Wachovia Bank in 2007.[90] Mr. Tucker testified that he relies on loan documents to assess risk when deciding whether or not

---

[83] See 2/12/09 at 110:4-111:1.

[84] 2/9/09 Tr. at 7-25.

[85] Id. at 8:20-9:8.

[86] Id. at 18:16-24.

[87] Id. at 19:21-20:4.

[88] Id. at 20:5-8.

[89] 2/6/09 Tr. at 57:12-16.

[90] Id. at 57:19-25.

to buy a loan from a bank.[91]  He also stated that he relied on the Defendant's loan documents,

including his personal and business tax returns, when he decided to buy Defendant's loan from

Wachovia.[92]

 Finally, the Government submitted for the jury's review not only the loan documents

from Wachovia Bank,[93] but also the personal and business tax returns Defendant submitted to the

IRS.[94]  On this evidence, a reasonable juror could have found that the Government proved the

materiality of Defendant's false representations beyond a reasonable doubt.

 Nevertheless, the Government need not have proved materiality beyond a reasonable

doubt, as it is not an essential element of this offense.  The statute under which this count was

charged provides as follows:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice
> – (1) to defraud a financial institution; or to obtain any of the moneys,
> funds, credits, asserts, securities, or other property owned by, or under the
> custody or control of, a financial institution, by means of *false or
> fraudulent* pretenses, representations, or promises; shall be fined not more
> than $1,000,000 or imprisoned not more than 30 years, or both.[95]

The Third Circuit recently held that the phrase "false or fraudulent" must be read to give "the two

disjunctively connected terms separate meanings."[96]  Following the Third Circuit's reasoning, the

---

[91] Id. at 57:23-25, 58:8-11.

[92] Id. at 59:15-17, 60:7-21.

[93] Gov't Trial Ex. 52 (loan documents from Wachovia Bank).

[94] Gov't Tr. Exs. 61A (comparison of Defendant's personal tax returns from Wachovia's loan documents with those submitted to the IRS), 61B (comparison of Defendant's business tax returns from Wachovia's loan documents with those submitted to the IRS).

[95] 18 U.S.C. § 1344 (emphasis added).

[96] United States v. Saybolt, No. 07-4392 & 4429, slip op. at 10 (3d Cir. August 18, 2009).

Court will give these terms separate meanings by reading the bank fraud statute as demanding a showing that the pretenses, representation or promises were "either 'fraudulent,' which would require proof of materiality, or 'false' . . . which would not require proof of materiality."[97] Hence, proof of materiality is not always required to establish a violation of the bank fraud statute, as establishing that false representations were made to a bank is sufficient to convict a defendant.  Here, the Government produced evidence from which a reasonable factfinder could find that Defendant made false representations to Wachovia.  This, by itself and without any showing as to materiality, is sufficient for the Court to deny Defendant judgment of acquittal on Count Eleven.  Hence, the Court will deny Defendant's motion for judgment of acquittal on Count Eleven.

       An appropriate Order follows.

---

[97] Id. at 9.